IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHARON RANDOLPH, et al.                  :

                                         :

        v.                               :    Civil Action No. DKC 09-1790

                                         :

ADT SECURITY SERVICES, INC.              :

                                         :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Fair Labor Standards Act ("FLSA") case are cross-motions for summary judgment filed by Plaintiffs Sharon Randolph and Tami Thompson and Defendant ADT Security Services, Inc. ("ADT"). (ECF Nos. 48, 50). Also pending are several motions to seal certain exhibits that were filed in connection with the parties' cross-motions. (ECF Nos. 50, 54, 59). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, both motions for summary judgment will be granted in part and denied in part. The motions to seal will all be granted.

**I.    Background**

**A.    Factual Background**

Unless otherwise noted, the following facts are uncontroverted.

On December 1, 2008, Randolph and Thompson began working at the Lanham, Maryland office of ADT, a security company. ADT hired the two as Residential Resale Representatives, a position in which they sold ADT products and services to individuals. ADT required them to meet a certain sales quota each week, and both plaintiffs were paid on a commission-only basis after some initial weeks of training wages. This commission-based plan was explained in the offer letters that they received and the compensation plan they were given when they started work. Plaintiffs were at-will employees.

When Plaintiffs joined ADT, they each received copies of the ADT Team Member Handbook (the "Handbook") and a Tyco Guide to Ethical Conduct ("Guide to Ethical Conduct").[1] Among other things, these company publications stressed the private and confidential nature of protected customer information (and the company's own proprietary business information):

> Customers and suppliers entrust us with sensitive information[.] . . . In addition, much of the information you obtain while employed by us is propriety business information that must not be disclosed. Therefore, your employment imposes an obligation on you to maintain confidentiality, even after you leave ADT.

---

[1]     ADT is a subsidiary of Tyco International Ltd.

(ECF No. 48, Ex. A, at ADT 172).  The Handbook specifically instructs that employees should not discuss any business or confidential information with anyone outside ADT.  It provides some examples of confidential information and directs employees to ask their supervisors about disclosing information.  The Guide to Ethical Conduct similarly stressed that customer and employee data was only to be disseminated for business purposes and in accordance with the law.

Some time after receiving their first paycheck from ADT, Plaintiffs became unhappy with their pay and began to voice complaints.  In particular, Plaintiffs were concerned that they were (1) not receiving promised bonuses for exceeding their sales quotas and (2) facing unexpected commission reductions based on customer cancellations.[2]  These concerns led Plaintiffs to complain to ADT residential resale manager Chancey Manwiller and area sales manager Robin McVey.  Both Manwiller and McVey concluded that Plaintiffs simply had a good faith misunderstanding of their compensation plan.

Apparently unhappy with the response they received from ADT, Plaintiffs decided to contact the Maryland Department of Labor, Licensing, and Regulation ("DLLR").  While riding in a

_____

[2]  ADT disputes that there were any such problems with its compensation scheme.

car with Randolph, Thompson called the DLLR to discuss their compensation concerns. The DLLR responded by sending Plaintiffs a blank wage claim form to complete. The form instructed Plaintiffs to fill out the form and provide documentation supporting their claims, including, for example, "an employment contract, wage agreement, commission statements, invoices, time records, list of hours worked, check stubs, written fringe benefit . . . policy or contract." (ECF No. 48, Ex. J, at ADT 220). The bottom of the form further emphasized the importance of documentation, stating:

> If your claim pertains to company paid benefits (ex: vacation), and/or you worked under a written contract, please attach a photocopy of all relevant documents. If documentation is not available, you must attach a complete explanation of the policy and/or contract. Please attach any other *relevant* documentation which could assist in proving your claim.

(*Id.* (emphasis in original)).

Plaintiffs each completed a wage claim form and gathered a number of documents to send to the DLLR to support their claims. Among other things, Plaintiffs submitted copies of their compensation plan, pay stubs and commission statements, company handbooks, company sales reports, and individual residential service contracts with clients. The documents establish what products and services Plaintiffs sold, what payments they were

promised from ADT, what hours they worked, and what payments they actually received. Yet the service contracts also contained a variety of personal information about ADT customers, including customer names, addresses, phone numbers, and payment information. Some of the submitted information also indicated what services ADT customers had obtained and spelled out specific information about those services (*e.g.*, where alarm panels were located, alarm passwords, etc.).[3] Randolph also sent the DLLR copies of PowerPoint slides detailing an ADT "reactivation" program that ADT characterizes as proprietary. Neither Thompson nor Randolph asked for permission from their customers or supervisors before disclosing the above information to the DLLR, but they were entitled to maintain the documents for their own records.

The DLLR received Plaintiffs' materials on March 25, 2009.[4] A few days later, on either April 2 or April 3, 2009, the DLLR notified ADT that Plaintiffs had submitted wage claims and sent the company copies of the claim forms (and all supporting documentation). After ADT Human Resources coordinator Roberta

---

[3]     Plaintiffs have admitted that some of this information, at least as a general matter, is confidential.

[4]     The DLLR eventually closed its investigation on April 6, 2009, as Plaintiffs' claims exceeded $50,000 and the office was only empowered to investigate claims of $20,000 or less.

McCarten received the submissions, she contacted Manwiller about them. Manwiller then spoke to McVey, Area Human Resources Manager Theresa Maia, and Human Resources director Angela Bloomfield. The company also consulted counsel.

ADT decided to suspend Randolph and Thompson pending an investigation, ostensibly for violating the company's confidentiality policy. Later, in two letters from Manwiller dated April 10, 2009, ADT terminated Plaintiffs. According to the letter, ADT's investigation determined that Plaintiffs had "violated company policy" by (1) breaching "confidentiality agreements that [were] in [ADT's] compensation plans for sales representatives"; (2) disclosing "customers' personal data" to a third party; and (3) disclosing "company confidential information to a third party." (*See, e.g.*, ECF No. 48, Ex. B, at ADT 1).[5]

### B. Procedural Background

Plaintiffs filed their complaint against ADT on July 21, 2009. (ECF No. 1). The complaint contained two counts: a claim under the FLSA and a claim asserting wrongful termination "under the Maryland public policy exception to at-will

---

[5]     In deposition testimony, the relevant decisionmakers further clarified that Plaintiffs were dismissed specifically because they disclosed confidential customer information and information concerning ADT's reactivation program.

employment."[6]  (*Id.* ¶¶ 39-52).  Roughly two months later, on August 26, 2009, ADT filed a motion to dismiss the complaint. (ECF Nos. 6, 9).  Plaintiffs then filed an amended complaint (ECF No. 12), but ADT asked that its previous motion to dismiss be applied to the amended complaint (ECF No. 14).  After receiving full briefing from the parties, the court denied ADT's motion to dismiss on March 23, 2010.  (ECF Nos. 23, 24).

After discovery was largely completed, ADT moved for summary judgment on October 8, 2010.  (ECF No. 48).  In response, Plaintiffs cross-moved for partial summary judgment on the issue of liability, while reserving the issue of damages. (ECF No. 52).  ADT then filed a concurrent reply (on its own motion) and opposition (on Plaintiffs' cross-motion) on November 12, 2010.  (ECF No. 57).  Plaintiffs filed their reply on November 24, 2010, which they supplemented with additional authority on December 3, 2010.  (ECF Nos. 60, 61).  In connection with the briefing on the summary judgment motions, both parties submitted motions to seal certain exhibits submitted with their memoranda.  (ECF Nos. 50, 54, 59).

---

[6]  The complaint contains only two counts, but those counts are labeled "count I" and "count III."

## II. Cross-Motions for Summary Judgment

### A. Standard of Review

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. (citations omitted). At the same time, the court must

construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

When faced with cross-motions for summary judgment, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). The court reviews each motion under the familiar standard outlined above. The court must deny both motions if it finds there is a genuine issue of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Federal Practice & Procedure § 2720.

## B. Analysis

As explained above, Plaintiffs' complaint contains two counts. In the first, Plaintiffs assert that ADT violated the FLSA by firing them in retaliation for filing a complaint related to an unfair wage practice. In the second count, Plaintiffs aver that ADT wrongfully terminated them in retaliation for exercising a statutory right. The court addresses each in turn.

1.  **Fair Labor Standards Act**

"Congress originally enacted the FLSA to protect all covered workers from substandard wages and oppressive working hours, labor conditions that are detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers." *Lopez v. NTI, LLC*, 748 F.Supp.2d 471, 476 (D.Md. 2010) (quotation marks and brackets omitted). To achieve that purpose, Congress also enacted an FLSA anti-retaliation provision. *Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008); *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S.Ct. 1325, 1333 (2011). One part of that provision, sometimes called the "complaint clause," provides that an employer may not "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." 29 U.S.C. § 215(a)(3). While the language of the FLSA's anti-retaliation provision is "much more circumscribed" than many other employment retaliation provisions, *King v. Marriott Int'l Inc.*, 337 F.3d 421, 427 (4th Cir. 2003),[7] the Supreme Court has

_____

[7]     ADT places great weight on the purportedly narrower scope of the FLSA's anti-retaliation provision. Differences in scope might be read two ways, though. "[T]he use of broader language elsewhere may mean (1) that Congress wanted to limit

10

indicated that courts should broadly interpret the provision to effectuate the remedial purposes of the Act, *Kasten*, 191 S.Ct. at 1334.

"A plaintiff asserting a prima facie claim of retaliation under the FLSA must show that (1) he engaged in an activity protected by the FLSA; (2) he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action." *Dareveau*, 515 F.3d at 340. In this case, the parties focus primarily on the first aspect of a prima facie showing: whether Plaintiffs engaged in a protected activity. Both parties essentially agree that Plaintiffs were fired because of the documentation they submitted to the DLLR. Thus, the fundamental question here is whether "Plaintiffs properly submitted the documentation" and consequently engaged in a protected activity in doing so. (ECF No. 60, at 1).

This court has already held that filing a minimum wage-related complaint with a state agency can amount to a protected activity. *See Randolph v. ADT Sec. Servs., Inc.*, 701 F.Supp.2d

the scope of the phrase before us . . ., or (2) that Congress did not believe the different phraseology made a significant difference in this respect." *Kasten*, 131 S.Ct. at 1333.

740, 745-46 (D.Md. 2010) (citing *Sapperstein v. Hager*, 188 F.3d 852 (7th Cir. 1999)). This is so because such a complaint would be related to the FLSA in that it would put a "reasonable, objective" employer "on notice that the employee is asserting statutory rights under the Act." *Kasten*, 131 S.Ct. at 1335 (brackets omitted).[8] But even though a complaint filed with a state agency may amount to protected activity, the matter is complicated here by Plaintiffs' submission of various confidential documents in support of their complaints to the DLLR. ADT maintains that, in light of the confidential nature of the documents, Plaintiffs did not engage in protected activity in filing the supporting documentation because Plaintiffs' allegedly protected activity was not part of the "complaint" and was unreasonable.

### a. The Reasonableness Requirement

The parties all apparently agree - mistakenly, as it turns out - that the disclosure of confidential documents cannot amount to protected activity unless it is in some sense reasonable. Their argument draws from a line of cases imposing

---

[8] It is also worth noting that the Department of Labor has construed the phrase "filed any complaint" to include complaints to "State or local agencies" in an interpretative regulation of an identical provision in the Occupational Health and Safety Act. *See* 29 C.F.R. § 1977.9(b) (interpreting 29 U.S.C. § 660(c)(1)).

a "reasonableness" requirement in other employment contexts. In *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253 (4th Cir. 1998), for example, the Fourth Circuit considered whether an employee's disclosure of certain confidential documents amounted to opposition activity under Title VII of the Civil Rights Act of 1964. To resolve the issue, the court "balance[d] the purpose of the Act . . . against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Id.* at 259. In balancing the particular facts of that case, the court "easily conclude[d] that the employer's interest in maintaining security and confidentiality of sensitive personnel documents outweigh[ed] the [employee]'s interest in providing those documents to [another employee]." *Id.* at 260. Indeed, the court termed the employee's actions "disproportionate and unreasonable," while the employer's interest in guarding against the dissemination of its confidential records was deemed "reasonable and significant." *Id.* Several other courts of appeal have also imposed some form of a reasonableness requirement in cases involving the disclosure of confidential documents.[9] *See, e.g.*, *Niswander v. Cincinnati Ins. Co.*, 529

_____

[9]     Like *Laughlin*, however, cases in other circuits are not always clear or consistent on what facts are relevant in

F.3d 714, 727 (8th Cir. 2008) (finding employee's disclosure was not protected activity under Title VII); *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996) (finding employee's disclosure was not protected activity under Age Discrimination and Employment Act ("ADEA")); *Kempcke v. Monsanto Co.*, 132 F.3d 442, 446 (8th Cir. 1998) (recognizing that misuse of confidential documents may render an act unprotected under the ADEA, but finding that employee was reasonable in particular facts of case); *Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir. 1980) (finding "surreptitious copying and dissemination" of documents was not protected under Title VII).

In arguing that the reasonableness balancing test applies to this case, both sides overlook the distinction between opposition clause cases and participation clause cases. Most of

---

applying the balancing tests (although there are some overlapping features). As one court has put it, "[t]here is . . . no clear consensus among the courts about what the appropriate factors are, or about how to weigh them in comparison to the concededly legitimate needs of the employer for protection of its confidential documents and its rights to conduct its business free of unnecessary interference." *Quinlan v. Curtiss-Wright Corp.*, 204 N.J. 239, 266-67 (2010). As explained below, the Fourth Circuit has expressed an unwillingness to impose a reasonableness requirement on participation clause cases under Title VII precisely because such a requirement is "nebulous." *Glover v. S. Carolina Law Enforcement Div.*, 170 F.3d 411, 415 (4th Cir. 1999).

the cases above are opposition clause cases, wherein the employee alleges that he was retaliated against because he opposed an unlawful employment practice. But the FLSA's complaint clause is more akin to a participation clause, which generally bars retaliation based on an employee's involvement in or initiation of an investigation, proceeding, or hearing. For example, like the FLSA provision in this case, Title VII's participation clause makes it unlawful to retaliate against an employee "because he has made a charge." 42 U.S.C. § 2000e-3(a); *cf. Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544, 552 (4th Cir. 1999) (finding participation in state agency proceeding was protected activity under Title VII's participation clause).

The distinction between opposition and participation is important because the level of protection varies in participation clause and opposition clause cases. *See Laughlin*, 149 F.3d at 259 n.4 ("[T]he scope of protection for activity falling under the participation clause is broader than for activity falling under the opposition clause."). While protected activity under the opposition clause must be "reasonable," the Fourth Circuit has specifically refused to apply any reasonableness requirement in the participation clause context. *See Glover v. S. Carolina Law Enforcement Div.*, 170 F.3d 411, 414 (4th Cir. 1999) ("The plain language of the

participation clause itself forecloses us from improvising such a reasonableness test."); *Kubicko*, 181 F.3d at 554 ("Application of § 704's participation clause . . . does not turn on the substance of an employee's testimony."); *see also Cumbie v. Gen. Shale Brick, Inc.*, 302 F.App'x 192, 194 (4th Cir. 2008) ("[W]hen an individual engages in activities constituting participation, such activity is protected conduct regardless of whether that activity is reasonable."); *Martin v. Mecklenburg Cnty.*, 151 F.App'x 275, 279 (4th Cir. 2005) (explaining that it was "of no moment" that employee's statements arguably bore no relevance to pending Title VII action, so long as statements were given in meeting related to that Title VII proceeding); *accord Slagle v. Cnty. of Clarion*, 435 F.3d 262, 268 (3[d] Cir. 2006) (listing cases establishing that participation clause activity is essentially an absolute protection).[10]

---

[10]    The difference in treatment between participation and opposition clause claims stems from the nature of the activities protected under each clause. A reasonableness test is necessary when dealing with opposition clause activity because of the broad range of conduct (ranging from the productive to the grossly destructive) that could necessary fall within such a clause. *Glover*, 170 F.3d at 415. In contrast, a participation clause is typically "unambiguous and specific," applying to only a few particular activities. *Id.* Those activities are critical to the operation of the various employment statutes. Thus, courts need not be as zealous in guarding against abusive invocations of the clause. Because applying a "slippery reasonableness standard" would only serve to chill the employee's participation, the court insisted that the

If Title VII's participation clause provides the closer analogy to the FLSA's complaint clause, and if reasonableness has no place in a participation clause analysis,[11] then one conclusion inexorably follows: reasonableness does not have a place in a complaint clause analysis either. Consequently, although both parties place heavy reliance on the reasonableness balancing test described in *Laughlin* and other cases, that test is irrelevant.

### b. Defining "Complaint"

The only real question then, is whether the supporting documentation Plaintiffs submitted to the DLLR was actually a

---

application of the participation clause could not "turn on the substance" of that participation. *Id*. at 414. ADT emphasizes that the language of the FLSA's complaint clause is narrower than the participation clause in Title VII; under *Glover*'s reasoning, that would be even more reason not to apply a reasonableness test – as the complaint clause is even more specific.

[11] *Niswander*, a case cited by both parties, suggests that a balancing test does apply – even in the participation clause context – "when confidential information is at issue." 529 F.3d at 726. The Sixth Circuit's decision in *Niswander*, however, would seem to be at odds with the Fourth Circuit's decision in *Glover*, which refused to find an employee's participation clause activity unreasonable, even where the employee offered information that the district court characterized as "unresponsive, uncompelled, and gratuitous." 170 F.3d at 413. Moreover, *Niswander* was "not a case of an employee mistakenly or inadvertently delivering confidential information out of a belief that the documents provided direct proof of discrimination." 529 F.3d at 722. As explained below, that is exactly the case here.

part of Plaintiffs' "complaint," such that ADT was unjustified in dismissing Plaintiffs because of it. ADT maintains that the complaint consisted only of the two or three page Maryland Wage Claim Forms that Randolph and Thompson each filled out. Plaintiffs respond that all of the supporting documentation was a part of the complaint.

The parties have not identified,[12] and the court is not aware of, any case law explaining whether documents attached to a formal agency document fall within the scope of an FLSA

---

[12] ADT cites two FLSA cases that it says support its reading of the statute, but those cases are inapposite. In *Hodgson v. Texaco Inc.*, 440 F.2d 662, 663 (5th Cir. 1971), the Fifth Circuit agreed that the employer-defendant did not retaliate against its employee when it fired the employee for introducing certain exhibits in his FLSA suit that he had taken from the company without permission. In that case, the court specifically noted that it was not the *use* of the information that instigated the dismissal, but rather the unauthorized taking. *Id.* Here, Plaintiffs' dismissal was based on their *disclosure* of the information, not the taking of records (which, in any event, they were entitled to maintain under ADT policy). ADT also misreads *Hamby v. Associated Ctrs. for Therapy*, 230 F.App'x 772 (10th Cir. 2007). In *Hamby*, the Tenth Circuit determined that the employer had offered a legitimate, non-retaliatory reason for the employee's discharge that the employee had failed to rebut with evidence of pretext. *Id.* at 785. In particular, the employer explained that it had terminated the employee for disclosing a client's confidential information. *Id.* That disclosure, however, was in *no way* related to the employee's then-pending FLSA claim and occurred more than a week after the complaint was filed. *Id.* In this case, the challenged disclosure occurred when Plaintiffs submitted their complaint.

"complaint" for purposes of Section 215(a)(3).[13]  Therefore, it seems appropriate to start the analysis of Section 215(a) from the beginning - with "an examination of the statute's plain text."  *See Broughman v. Carver*, 624 F.3d 670, 675 (4th Cir. 2010) (quotation marks omitted).  In interpreting the plain language of a statute, [courts] give the terms their ordinary, contemporary, common meaning, absent an indication Congress intended [them] to be some different import."  *Crespo v. Holder*, 631 F.3d 130, 133 (4th Cir. 2011).[14]

Here, some dictionary definitions suggest that "complaint" would encompass supporting documentation included with a formal agency form.  Such definitions broadly define "complaint" as

---

[13]  Language that is identical or similar to the FLSA's complaint clause is found in several other anti-retaliation provisions.  *See, e.g.*, 29 U.S.C. § 660(c)(1); 29 U.S.C. § 1855(a); 29 U.S.C. § 2002(4)(A); 8 U.S.C. § 1324b(a)(5); 49 U.S.C. § 31105(a)(1)(A); 29 U.S.C. § 2934(f).  The fact that there are no cases accepting - or even addressing - ADT's interpretation of "complaint," despite the plethora of provisions including such language, might be some indication of the aberrant nature of ADT's position.

[14]  On the other hand, the Supreme Court has long recognized that an overly rigid adherence to the text of the FLSA might be inappropriate.  Rather, interpreting provisions of the FLSA can be done only "by discarding formalities and adopting a realistic attitude, recognizing that we are dealing with human beings and with a statute that is intended to secure to them the fruits of their toil and exertion."  *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 592 (1944), *superseded on other grounds by* 29 U.S.C. § 254.

among other things, an "expression of grief, pain, or dissatisfaction . . . something that is the *cause or subject* of protest or outcry." *Merriam Webster Online Dictionary* (2011); *see also Oxford English Dictionary Online* (2011) (defining complaint as a "representation of wrong suffered"); *Cambridge Dictionary of American English* 172 (2000) (defining complaint as "a statement that something is wrong or not good enough"); *Webster's New International Dictionary of the English Language* 546 (2$^d$ ed. 1941) (defining complaint as an "[e]xpression of grief, regret, pain, censure, grievance, or resentment . . ."). The supporting documentation in this case would seem to fit these definitions, as it helped Plaintiffs to articulate their perception that they were being wrongfully underpaid. In other words, it established the "subject" of their displeasure.

There is no need to rely on dictionary definitions alone. In the standard civil litigation context, for instance, the notion of a "complaint" embraces attached supporting documentation. Federal Rule of Civil Procedure 10(c) provides that "[a] copy of a written instrument that is an exhibit to a pleading [such as a complaint] is a part of the pleading for all purposes." Consequently, courts routinely rely on supporting documentation in evaluating the sufficiency of a civil complaint. *Sec'y of State for Defence v. Trimble Navigation*

*Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *see also Patane v. Clark*, 508 F.3d 106, 111 n.2 (2[d] Cir. 2007) ("[A] complaint includes documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." (quotation marks omitted)); *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (stating that, in evaluating sufficiency of a complaint, courts may "consider material which is properly submitted as part of the complaint" (quotation marks omitted)). "Although unknown at common law, this practice of incorporating exhibits into a pleading was part of federal equity pleading prior to the federal rules and was expressly adopted by a majority of code jurisdictions." 5A Charles Alan Wright & Arthur Miller, *Federal Practice & Procedure* § 1327 (3[d] ed. 2010 supp) (citing cases). Thus, the idea that an exhibit was a part of a complaint was established in "contemporaneous judicial usage" when the FLSA was passed in 1938. *Kasten*, 131 S.Ct. at 1332.

The fact that a "complaint" is generally thought to include any attached supporting documentation is also seen in other employment-related contexts. Title III of the Civil Rights Act of 1964, for instance, defines "complaint" as "a writing or document" within the meaning of 18 U.S.C. § 1001, which in turn governs *any* document – not simply a formal charging document –

submitted to a federal agency. *See* 42 U.S.C. § 2000b-3. Similarly, in evaluating the sufficiency of a charge under the ADEA (which might be considered the functional equivalent of an FLSA complaint), the Supreme Court looked to attached documentation beyond the form provided by the agency. *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 405 (2008) (finding a "charge" sufficient in light of an attached affidavit). There is no obvious reason why the same principles would not apply in FLSA cases.

Furthermore, a reading of the term "complaint" that embraces attached exhibits serves the legislative purposes of the Act. The Supreme Court has indicated that the "enforcement needs" of the FLSA "argue for an interpretation of the word 'complaint' that would provide broad rather than narrow protection to the employee." *Kasten*, 131 S.Ct. at 1334. ADT's position would provide profoundly narrow protection to employees, in that it would create a troubling dilemma for an employee who wishes to file a complaint: the employee could either present unsubstantiated claims limited to the formal claims form or risk dismissal from his job if he strays from company policy (however innocently) in the course of supporting his claim. An employee should not be forced to take such a "calculated risk" in exercising the FLSA's statutory remedies.

*Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 293 (1960).

Perversely, ADT's position would result in a situation wherein employees with the *most* supporting evidence would also face the *greatest* risk of dismissal. As a result, enforcement agencies would be less able to undertake early assessments of employees' claims, as employees could not be expected to provide much evidence on their own (for fear of exposing themselves to termination). Employers would then have to face greater government intrusions into their business while the complaint was investigated; because of the lack of early information, these investigations would likely last longer. Meanwhile, employers would have an incentive to cull through every document attached to an FLSA complaint, looking for any violation of company policy in an effort to forestall expensive litigation. More problematically, they could simply choose to impair the ability of employees to make claims at all by dubbing all possible supporting documentation "confidential." Such a situation would grossly undermine enforcement of the FLSA, which hinges upon "*information* and complaints received from employees." *Id.* at 292 (emphasis added). The FLSA anti-retaliation is about the free sharing of information and a

narrow view of complaint would hamstring that fundamental purpose.

A finding that supporting materials are part of the complaint would also comport with the Supreme Court's approach to the analogous anti-retaliation provision in the National Labor Relations Act ("NLRA"). *See Kasten*, 131 S.Ct. at 1334 (comparing NLRA and FLSA anti-retaliation provisions); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 723 (1947) (explaining that decisions interpreting the NLRA are useful in interpreting the FLSA). In *NLRB v. Scrivener*, 405 U.S. 117, 118-20 (1972), an employer fired four employees for giving testimony as part of an investigation by the National Labor Relations Board. Even though the Court found that the employees did not fall within the scope of a rigid reading of the NLRA's anti-retaliation provision, the Court nevertheless deemed the employees' activities protected because they "participat[ed] in the investigative stage." *Id.* at 121. In the eyes of the Court, "Congress has made it clear that it wishes all persons with information about [violative] practices to be completely free from coercion against reporting them to the Board." *Id.* The same considerations would suggest that employees should be completely free to provide all the information they wish in advancing a complaint under the FLSA.

In sum, dictionary definitions of the word "complaint," the use of that word in other cases and statutes, and the legislative purposes of the FLSA all support the conclusion that supporting documentation is a part of an FLSA complaint. Thus, the filing of such documents is one aspect of the protected activity of filing a complaint. Plaintiffs engaged in protected activity in submitting their supporting documentation to the DLLR.

Indeed, the facts of this case provide an example of the fundamental fairness of the approach the court adopts. As both parties recognize, the DLLR claim form used by both Plaintiffs specifically instructed them to file supporting documentation.[15]

_____

[15] This fact distinguishes the present case from *Harris v. Richland Cmty. Health Care Ass'n, Inc.*, No. 3:07-0421-CMC-PJG, 2009 WL 2983010, at *2-3 (D.S.C. Sept. 14, 2009), a Title VII case upon which ADT extensively relies. In that case, the court determined that the plaintiff did not engage in protected activity when she attached certain confidential documents to a charge filed with a state agency. *Id.* The court emphasized, however, that the confidential documents in that case were "neither required to be filed as part of a charge nor something that a typical employee would be able to access for this purpose." *Id.* at *3. In this case, the documents Plaintiffs submitted were in fact the types of documents that would ordinarily support a complaint, as evidenced by the instructions found on the cover of the DLLR form. Moreover, the documents at issue in this case largely pertained to documents *created and maintained* by Plaintiffs, evidencing their *own work*; such documents stand in sharp contrast to the files at issue in *Harris*, which concerned the work of other employees. *Id.* at *3 n.3.

Many of the examples listed on the DLLR form are exactly the types of documents submitted by Plaintiffs in this case. While some of the documents submitted by Plaintiffs contained information characterized by ADT as confidential, those same documents also provided support for Plaintiffs' wage claims by evidencing the work done by Plaintiffs, the payments received by ADT from customers, the payments received by Plaintiffs, and the promises concerning payment that were made to Plaintiffs when they began their employment. (*See* ECF No. 52-7, at 75:10-12 (Thompson explaining: "Well, I'm not a DLLR investigator, so I'm sending documents that they asked me to submit.")). It would seem contrary to the purposes of the FLSA to punish them for complying with the instructions they received from the DLLR.

### c. Direct Evidence

The record is clear that ADT fired both Plaintiffs because they disclosed certain documents to the DLLR. Because the disclosure of those documents was a protected activity, Plaintiffs suffered retaliation for "filing a complaint." Although ADT complains that Plaintiffs have not satisfied the requirements of the *McDonnell Douglas* burden shifting test (often used in employment cases), *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973), it is not necessary for a plaintiff who summons direct evidence to satisfy that test.

26

*Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003) ("Retaliation may be proved either via direct evidence or the burdenshifting scheme of [*McDonnell Douglas*]."); *cf. Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (finding, in the discrimination context, that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence"); *see also Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) ("Courts must, however, resist the temptation to become so entwined in the intricacies of the proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non*." (quotation marks omitted)). In this case, ADT has "announced, or admitted, or otherwise unmistakably indicated that [a forbidden consideration] was a determining factor" in its decision to fire them. *Cline v. Roadway Exp., Inc.*, 689 F.2d 481, 485 (4th Cir. 1982). ADT's explicit admissions that Plaintiffs lost their jobs because of the filings with the DLLR mandate only one conclusion: ADT retaliated against Plaintiffs because they engaged in a protected activity. Summary judgment must therefore be granted for the Plaintiffs on count one of the complaint on the issue of liability.

## 2. Abusive Discharge

Plaintiffs also assert a claim for abusive discharge under Maryland state law. As the prior opinion in this case explained, however, "the availability of a civil remedy under the FLSA, a federal statute, preclude[s] application of the tort of abusive discharge under Maryland law." *Randolph*, 701 F.Supp.2d at 747 (citing *Chappell v. S. Maryland Hosp., Inc.*, 320 Md. 483, 496-97 (1990)); *see also Magee v. DanSources Tech. Servs., Inc.*, 137 Md.App. 527, 570 (2001) (finding availability of civil remedies under the FLSA precluded abusive discharge claim, even where employee did not file complaint regarding violations of the FLSA); *cf. Orci v. Insituform East, Inc.*, 901 F.Supp. 978, 982-83 (D.Md. 1995) (finding plaintiff could not raise abusive discharge where he claimed discharge was retaliation for attempts to create affirmative action plan; such claim could be vindicated under Title VII). Because Plaintiffs' "retaliation for reporting . . . violations of state and federal minimum wage laws" may be vindicated under the FLSA, their abusive discharge claim may not proceed. *Chappell*, 320 Md. at 496-97. Summary judgment on the second count of the complaint (dubbed Count III) will be granted for ADT.

### III. Motions to Seal

Plaintiffs and ADT have also submitted motions to seal. A motion to seal must comply with Local Rule 105.11, which provides:

> Any motion seeking the sealing of pleadings, motions, exhibits or other papers to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections. The Court will not rule upon the motion until at least 14 days after it is entered on the public docket to permit the filing of objections by interested parties. Materials that are the subject of the motion shall remain temporarily sealed pending a ruling by the Court. If the motion is denied, the party making the filing will be given an opportunity to withdraw the materials.

This rule endeavors to protect the common law right to inspect and copy judicial records and documents, *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), while recognizing that competing interests sometimes outweigh the public's right of access, *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).

Before sealing any documents, the court must provide the non-moving party with notice of the request to seal and an opportunity to object. *Id.* This notice requirement may be satisfied by either notifying the persons present in the

courtroom or by docketing the motion "reasonably in advance of deciding the issue." *Id.* at 234. Finally, the court should consider less drastic alternatives to sealing, such as filing redacted versions of the documents. If the court decides that sealing is appropriate, it should also provide reasons, supported by specific factual findings, for its decision to seal and for rejecting alternatives. *Id.* at 235.

Both parties seek to seal certain exhibits in connection with the cross-motions for summary judgment. Both motions currently stand unopposed after having been on the docket for several months, and two of the three motions are in fact consent motions. All of the documents the parties wish to seal have been produced under a stipulated protective order under a "Confidential" designation. That designation would not seem to be without basis. Several of the documents include personal information about ADT clients who are not parties to this case, including individual home security setups and financial data. Other documents relate to private business information held by ADT, including pay structures and other matters. *See Pittson Co. v. United States*, 368 F.3d 385, 406 (4th Cir. 2004) (affirming decision to seal certain "confidential, proprietary, commercial, or financial data" that was produced under a protective order). *But see Minter v. Wells Fargo Bank, N.A.*,

258 F.R.D. 118, 123 (D.Md. 2009) ("Managerial structures and general information regarding business operations . . . fail to make the grade."). Given that this action finds its nexus in ADT's attempt to avoid the disclosure of such materials, it seems appropriate to seal them here. *See Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F.Supp.2d 479, 485 (D.Md. 2005) (sealing materials that went to "heart of th[e] case" concerning trade secrets); *Padco Advisors, Inc. v. Omdahl*, 179 F.Supp.2d 600, 614-15 (D.Md. 2002) (sealing materials in action "based on enforcing a non-compete clause in an employment contract in order to protect these trade secrets"). Redacting, or taking other less restrictive measures, would defeat the exhibits' usefulness in a case such as this, where the court must get a complete view of these materials in order to understand whether ADT is correct that they never should have been disclosed.

The parties' memoranda are not under seal and of necessity contain references to and quotations from some of the sealed exhibits. This opinion, too, refers to portions of the sealed exhibits, but one or the other of the parties has already referenced the material cited herein in an unsealed memorandum. Thus, although the opinion references some of the materials under seal, the opinion itself will not be filed under seal.

The parties may request any redactions they feel should be made in the public record with 14 days.

## IV. Conclusion

For the foregoing reasons, the motion for summary judgment filed by ADT will be granted in part and denied in part and the cross-motion for summary judgment filed by Plaintiffs will be granted in part and denied in part. All three of the motions to seal will be granted.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
