IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHARON RANDOLPH, et al.     :

                    :

    v.              :  Civil Action No. DKC 09-1790

                    :

ADT SECURITY SERVICES, INC.   :

                    :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Fair Labor Standards Act ("FLSA") case are motions to identify a "rebuttal" expert (ECF No. 94) and to seal (ECF No. 96) filed by Defendant ADT Security Services, Inc. ("ADT" or "the company"), and three motions filed by Plaintiffs Sharon Randolph and Tami Thompson: (1) a "motion for trial date and for punitive damages jury instruction" (ECF No. 88), (2) a motion to seal (ECF No. 103), and (3) a "motion to publish the court's unpublished memorandum opinion" (ECF No. 106). The issues are fully briefed, and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the "motion for trial date and for punitive damages instruction" will be granted in part and denied in part,[1] while the motions to

---

[1] Because a trial date was set during a telephone conference on March 15, 2012, the portion of Plaintiffs' motion seeking a trial date will be denied as moot.

publish and to identify a defense expert will both be denied. The motions to seal will be granted.

## I.   Background

The underlying facts of this case have been set forth repeatedly in the court's prior opinions, *Randolph v. ADT Sec. Servs., Inc.*, No. DKC 09-1790, 2011 WL 3476898 (D.Md. Aug. 8, 2011); *Randolph v. ADT Sec. Servs., Inc.*, 701 F.Supp.2d 740 (D.Md. 2010), and they need not be recounted in detail here. Plaintiffs worked as residential sales representatives at ADT's Lanham, Maryland, office and were paid on a commission-only basis.   When they were hired, both received copies of the employee handbook and a Tyco "Guide to Ethical Conduct," which stressed the confidential nature of customer information and certain company files about proprietary business systems.[2] Plaintiffs later became dissatisfied with their pay and voiced their concerns to various company managers.

Concluding that ADT did not respond in a satisfactory manner to these concerns, Plaintiffs thereafter contacted the Maryland Department of Labor, Licensing, and Regulation ("DLLR").   A DLLR representative sent Ms. Randolph and Ms. Thompson a blank wage form to complete, and the form expressly

---

[2] ADT is a subsidiary of Tyco International Ltd.

requested that they submit supporting documentation, such as wage agreements, commission statements, and invoices, along with their wage forms. Plaintiffs both completed the wage form and submitted copies of numerous documents, including commission statements, ADT's company handbook, and sales reports to DLLR. When ADT learned that Plaintiffs had disclosed this information, it suspended and subsequently terminated their employment, ostensibly for violating its confidentiality policy.

On July 21, 2009, Plaintiffs filed a complaint against ADT, asserting a retaliation claim under the FLSA and a claim for wrongful termination under Maryland law. ADT subsequently moved to dismiss, and this motion was denied. ADT answered the complaint, and an initial scheduling order was entered. It set forth the following schedule for expert disclosures and discovery: Plaintiffs' Rule 26(a)(2) expert disclosures were due by June 7, 2010; ADT's disclosures were due by July 7, 2010; Plaintiffs' rebuttal disclosures were due by July 21, 2010; all supplemental disclosures and responses pursuant to Rule 26(e)(2) were due by July 28, 2010; and, discovery would close on August 23, 2010. (ECF No. 26). On July 7, 2010, ADT filed a consent motion for extension of time to make its expert disclosures, stating that Plaintiffs had identified both of their experts but that the report from one of those experts – Dr. Joel Morse – had

not yet been provided.   ADT explained that it could "[]not properly evaluate its need for an expert witness without first reviewing Dr. Morse's report."   (ECF No. 39, at 2). Accordingly, ADT requested that the court extend its "expert disclosure deadline until a date 30 days after its receipt of Dr. Morse's expert report." (*Id.* at 3).   The court granted this request the following day.   ADT received Dr. Morse's report, along with a copy of Ms. Thompson's 2009 amended federal income tax return – which was discussed within the report – during July 2010.

On August 12, 2010, the parties filed a joint motion to revise the scheduling order.   (ECF No. 41).   This motion requested that the court extend the date for ADT's initial expert disclosures until August 16, 2010, with its expert report due on September 10, 2010, and the close of expert discovery on September 24, 2010.   The court granted the motion.   It does not appear that ADT identified an expert or provided Plaintiffs with an expert report by these dates.   Following the parties' submission of cross-motions for partial summary judgment, they sought to extend the date for expert discovery until two months after the court had ruled on the summary judgment motions.   (ECF No. 62).   The motion did not request any extension of time to

4

identify experts or provide expert reports.   This motion was also granted.

On August 8, 2011, the court issued a memorandum opinion and order granting in part and denying in part the parties' cross-motions for partial summary judgment.   (ECF Nos. 68, 69). With regard to the FLSA retaliation claim, the court entered judgment in favor of Plaintiffs and against ADT on the issue of liability.   With regard to the wrongful termination claim, the court entered judgment in favor of ADT and against Plaintiffs. Approximately two weeks later, ADT moved for reconsideration and for certification of an interlocutory appeal.

While these motions were pending, the parties repeatedly moved to revise the scheduling order to extend the due date of Plaintiffs' amended expert reports and the dates by which ADT would complete depositions of these experts.   The court subsequently granted the motions to revise the scheduling order. According to the final revised order, Plaintiffs' experts were to provide their amended reports by January 12, 2012, and ADT was to complete its depositions of Plaintiffs' experts by February 20, 2012.

The parties abided by this schedule.   Plaintiffs provided Dr. Morse's amended report to ADT on January 12, 2012.   The report stated that it was a "revision" based on the updated

report of Plaintiffs' second expert and updated tax data. (ECF No. 94-3, at 2). Plaintiffs also provided ADT with Ms. Thompson's 2010 tax return on February 17, 2012. ADT conducted Dr. Morse's deposition on February 20, 2012.

During this period, the court issued an opinion and order denying ADT's motions for reconsideration and for certification of an interlocutory appeal. (ECF Nos. 86, 87). On March 7, 2012, Plaintiffs filed their "motion for trial date and for punitive damages jury instruction." (ECF No. 88).[3] ADT has opposed the portion of the motion seeking a jury instruction for punitive damages and compensatory damages from emotional distress. On March 21, 2012, ADT filed a motion to identify a "rebuttal" expert "to respond to [new] opinions offered by [Dr. Morse]" during the February 20, 2012, deposition. (ECF No. 94-1, at 1). It also moved to seal exhibits, either in whole or in part, and portions of the memorandum accompanying this motion because those papers either contained or referenced Ms. Thompson's personal financial information or data from her tax returns. (ECF No. 96). Plaintiffs opposed ADT's motion to identify an expert and then filed a consent motion to seal the exhibit submitted in conjunction with its opposition (ECF No.

---

[3] Although its title refers only to punitive damages, Plaintiffs' motion also requests compensatory damages stemming from emotional distress.

103), which contained Ms. Thompson's 2009 federal tax return. Finally, on April 18, 2012, Plaintiffs filed a "motion to publish the court's unpublished [August 8, 2011,] memorandum opinion." (ECF No. 106). ADT has opposed this motion.

## II.  Plaintiffs' Motion "For Punitive Damages Instruction"

Plaintiffs' first motion, ostensibly seeking a jury instruction as to punitive damages, argues that punitive damages and compensatory damages for emotional distress are proper pursuant to 29 U.S.C. § 216(b), the civil remedies provision of the FLSA.  ADT vigorously contests this argument, asserting that neither form of damages is available under the FLSA.  As to punitive damages, ADT alternatively argues that "the undisputed facts" in this case would prevent Plaintiffs from making the showing necessary to obtain such an award.  (ECF No. 101, at 14).  ADT further maintains that the only available remedies here are equitable in nature and that "the trial in this matter should proceed as a bench trial." (*Id.* at 1).  Both parties are partially correct, and Plaintiffs' motion will, therefore, be granted in part and denied in part.

### A.  Plaintiffs Have Not Shown that Punitive Damages Are Warranted on the Facts of This Case

Section § 216(b) authorizes the following relief in private causes of action against employers who have violated the FLSA.

7

> Any employer who violates the provisions of section 206 or section 207 [the FLSA's minimum wage and overtime wage provisions] . . . shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who violates the provisions of section 215(a)(3) [the FLSA's anti-retaliation provision] . . . shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of [the anti-retaliation provision], including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages.

29 U.S.C. § 216(b).[4]   Plaintiffs contend that this language authorizes the court to award punitive damages in FLSA retaliation suits.

"Remarkably, the question of the availability of punitive damages under § 216(b) of the FLSA seems to have been little litigated." *Lanza v. Sugarland Run Homeowners Assoc., Inc.*, 97 F.Supp.2d 737, 739 (E.D.Va. 2000). The United States Court of Appeals for the Fourth Circuit has provided virtually no

---

[4] Congress added the language permitting recovery under the anti-retaliation provision in 1977. Fair Labor Standards Amendments of 1977, Pub.L. 95-151, 91 Stat. 1245, 1252 (1977). Prior to that time, "employees had to rely on the criminal and injunctive relief provided in sections 216(a) and 217 to discourage employers from retaliating against them." *Snapp*, 208 F.3d at 931 (citing *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 289 (1960)).

guidance on the issue,[5] and the two circuit courts that have addressed this question do not agree on the answer. *Compare Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 933-39 (11th Cir. 2000) (reasoning that punitive damages are not available under the FLSA), *with Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d 108, 111-12 (7th Cir. 1990) (Easterbrook, J.) (holding that the 1977 FLSA amendments providing for "legal relief" permit a court to award punitive damages). District courts throughout the country are similarly split. *Compare, e.g., Lanza*, 97 F.Supp.2d at 739-42 (concluding that punitive damages were unavailable under § 216(b))*, with, e.g., Marrow v. Allstate Sec. & Investigative Servs., Inc.*, 167 F.Supp.2d 838, 839-46 (E.D.Pa. 2001) (stating that a plaintiff may recover

---

[5] In a 1979 opinion, the Fourth Circuit stated in passing that the FLSA "of course, makes no provision for the recovery of punitive damages." *Walker v. Pettit Constr. Co.*, 605 F.2d 128, 130 (4th Cir. 1979), *modified on reh'g on other grounds sub nom. Frith v. E. Air Lines, Inc.*, 611 F.2d 950 (4th Cir. 1979). That opinion does not control the outcome here, however, because the panel did not consider the 1977 FLSA amendments, which added the "such legal or equitable relief" language that is at issue in this action, in reaching its conclusion. In fact, other than *Lanza*, only one other district court in this circuit has directly discussed the issue. *Jordan v. GoBo, Inc.*, No. 6:09-cv-00059, 2010 WL 1816361, at *8 (W.D.Va. Apr. 30, 2010) (finding that an employer was not liable for violating the FLSA and subsequently concluding, without discussion, that "[p]unitive damages [we]re not permitted under the FLSA" (citing *Lanza*, 97 F.Supp.2d at 742)), *aff'd*, 393 F.App'x 118 (4th Cir. 2010) (unpublished opinion), *cert. denied*, 131 S.Ct. 1021 (2011). The Fourth Circuit summarily affirmed *Jordan* without holding oral argument and without discussing this issue.

punitive damages in an FLSA action).  At this juncture, the decision on this legal issue need not be made.  Plaintiffs have not demonstrated facts that would support the imposition of punitive damages, so their *in limine* motion will be denied on this issue.

The parties agree that the standard for punitive damages initially set forth by the Supreme Court of the United States in *Smith v. Wade*, 461 U.S. 30 (1983), and subsequently codified at 42 U.S.C. § 1981a(b)(1), applies to the present case.  (ECF No. 101, at 14-15; ECF No. 105, at 1-4).[6]  This standard requires Plaintiffs to prove that ADT "engaged in a [retaliatory] practice . . . with malice or with reckless indifference to the[ir] federally protected rights."  *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 371 (4th Cir. 2008) (quoting 42 U.S.C. § 1981a(b)(1)).  "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging

---

[6] The court could identify no case law directly addressing the appropriate standard to use when determining whether a plaintiff is entitled to punitive damages in an FLSA action. The Pattern Jury Instructions for the Third Circuit, however, support the parties' conclusion that the § 1981a standard should apply.  Indeed, the comments to those instructions indicate that the punitive damages standard in § 1981a may be applied in actions involving punitive damages under § 216(b).  *Third Circuit Model Civil Jury Instructions* 11.3.7, *in* Modern Federal Jury Instructions:  Civil Pattern Instructions (2012).

in [retaliation]." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999). Additionally, "a positive element of conscious wrongdoing is always required." *Id.* at 538 (internal quotation marks omitted). Thus, even for plaintiffs seeking punitive damages on the basis of reckless indifference, there must be evidence demonstrating that the employer acted with "a subjective consciousness of a risk of injury or illegality." *Id.* at 536 (internal quotation marks omitted) ("[A]n employer must at least [retaliate] in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages."). Where a plaintiff cannot produce such evidence, submitting the issue of punitive damages to the jury is improper. *Id.* at 539; *see also Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 335-36 (4th Cir. 2003) (en banc) (setting aside a punitive damages award where – after "comb[ing] the record" – the Fourth Circuit could identify "no evidence that would allow a jury to find that [the defendant] knew that it might have been acting in violation of [the plaintiff's] 'federally protected rights'").

The record here fails to suggest a "positive element of conscious wrongdoing" on the part of any employee who played a role in Plaintiffs' termination. Plaintiffs identify no evidence even suggesting that ADT may have been aware that

terminating Plaintiffs for disregarding its confidentiality policy violated the FLSA.   Indeed, the depositions of those employees instead demonstrate that they believed the following: (1) Tyco's confidentiality policies were binding on ADT, (2) those policies expressly prohibited employees from providing customer or proprietary company information to *any* third party, regardless of the reason, (3) dissemination of this information could significantly harm ADT customers and its proprietary product development, and (4) Plaintiffs' termination was a necessary response to their violation of the company's confidentiality policy.[7]   There is no evidence that any of these employees had any indication Plaintiffs' terminations were unlawful.[8]   Notably, one ADT employee involved in the

---

[7] The assertion in Plaintiffs' motion papers that "ADT terminated [their] employment for complaining to DLLR and not resolving the issue at ADT" (ECF No. 88, at 9) misconstrues the deposition testimony of Robin McVey, one of the managers involved in the termination decisions.   Indeed, McVey's testimony indicates only that ADT terminated Plaintiffs for violating the company's strict confidentiality policy, not merely for filing a claim with DLLR.

[8] These employees also indicated that Plaintiffs' terminations were discussed with both the human resources department and legal counsel.   According to Plaintiffs, "[t]hat ADT's decision makers sought advice from counsel reveals that [they] had knowledge that terminating Randolph and Thompson may have been an action in violation of the law." (ECF No. 105, at 5).   This conclusion not only is unsupported by authority, but also – if true – would have the perverse effect of discouraging consultation with legal counsel in an effort to avoid punitive

terminations even emphasized that she had never received any training from ADT about anti-discrimination or retaliation statutes or the handling of any employee complaints, much less those involving confidential documents.

Faced with analogous circumstances, numerous courts have declined to permit a plaintiff to seek punitive damages at trial. *See Worldwide Network Servs., LLC v. Dyncorp Int'l, LLC*, 365 F.App'x 432, 446-47 (4th Cir. 2010) (unpublished opinion) (noting that punitive damage awards had been upheld where there was evidence that a managerial employee knew about federal anti-discrimination laws, but holding that no such evidence existed in the present case), *cert. denied*, 131 S.Ct. 224 (2010); *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 236 (2$^{d}$ Cir. 2000) (holding that punitive damages were not warranted in a discrimination case where the employer's termination of its former employee was "consistent with an employer acting to protect itself against" a legitimate concern about long-term employee absences); *EEOC v. Maha Prabhu, Inc.*, No. 3:07-cv-111-RJC, 2008 WL 2795515, at *2-3 (W.D.N.C. July 18, 2008)

damages should the action later be found unlawful. Accordingly, the bare fact that some ADT employees spoke with legal counsel about Plaintiffs' termination does not indicate that they had the subjective intent required for an award of punitive damages. This conclusion is particularly appropriate given the novel legal issues presented by this case.

(concluding that the employer's decision not to hire an employee because she had Lupus was not done with malice or reckless indifference where the decisionmaker had not received training about disability discrimination and was unaware that Lupus was a recognized disability under federal law); *cf. Kolstad*, 527 U.S. at 537 ("There will be circumstances were intentional discrimination does not give rise to punitive damages liability . . . . There will be cases . . . in which the employer discriminates with the distinct belief that its discrimination is lawful."). At bottom, Plaintiffs seek to argue that the court's finding of liability for retaliation should itself suffice for a jury to infer malice or reckless indifference. This argument, however, contravenes well-settled jurisprudence holding to the contrary. *E.g., Kolstad*, 527 U.S. at 534 (reasoning that a plaintiff must make an "additional demonstration" beyond "intentional discrimination" in order to obtain punitive damages (internal quotation marks omitted)). Because Plaintiffs have presented no evidence to indicate that ADT acted with malice or reckless indifference in terminating them, their motion seeking *in limine* ruling will be denied.

**B.   Compensatory  Damages  for  Emotional  Distress  Are Available Under § 216(b), and Plaintiffs May Seek Them Through a Jury Trial**

The  parties  also  disagree  about  whether  the  FLSA  permits recovery  of  compensatory  damages  stemming  from  emotional distress.   ADT maintains that, as a matter of law, Plaintiffs are  precluded  from  seeking  emotional  distress  damages  because such  damages  are  unavailable  under  "the  very  similar  damages provision  of  the  ADEA."   (ECF  No.  101,  at  18).   Plaintiffs disagree,  pointing  to  several  circuit  court  opinions  upholding such  awards.   On  this  issue,  Plaintiffs  have  the  better  end  of the argument.

Neither  the  Fourth  Circuit  nor  any  district  court  within this  circuit  has  previously  determined  whether  a  plaintiff  may recover  compensatory  damages  from  emotional  distress  in  an  FLSA action.   Four  circuit  courts  of  appeal  –  the  Sixth,  Seventh, Eighth,  and  Ninth  Circuits  –  have,  however,  either  directly  or indirectly  addressed  the  issue,  and  all  have  permitted  the recovery of emotional distress damages.   *Moore v. Freeman*, 355 F.3d 558, 563-64 (6th Cir. 2004) (explaining that "consensus on the  issue  of  compensatory  damages  for  mental  and  emotional distress [in FLSA cases] seems to be developing"); *Broadus v. O.K. Indus., Inc.*, 238 F.3d 990, 992 (8th Cir. 2001) (upholding a compensatory  award  that  may  have  included  damages  for  emotional

15

distress); *Lambert v. Ackerley*, 180 F.3d 997, 1011 (9th Cir. 1999) (affirming an award of emotional distress damages in an FLSA action); *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1226-30 (7th Cir. 1995) (reducing an award for emotional distress damages after finding the award excessive, but noting that such damages are available under the FLSA (citing *Travis*, 921 F.2d at 111-12)).

The compensatory nature of the remedies in § 216(b) supports the outcome in these cases. "The [FLSA's] statutory scheme contemplates compensation in full for any retaliation employees suffer from reporting grievances." *Moore*, 355 F.3d at 563 (citing *Snapp*, 208 F.3d at 934; *Lanza*, 97 F.Supp.2d at 740); *Republic Franklin Ins. Co. v. Albemarle Cnty. Sch. Bd.*, 670 F.3d 563, 568 (4th Cir. 2012) (citing *Snapp* and *Lanza* for the proposition that the relief provided in § 216(b) "is compensatory in nature"). The text of § 216(b) expressly provides for "such legal or equitable relief as may be appropriate to effectuate" this compensatory purpose, employing the broad phrase "without limitation" to indicate that the enumerated remedies within that section are not exhaustive. 29 U.S.C. § 216(b). "[L]ike the forms of relief mentioned [therein], damages for mental anguish are intended to compensate the injured party for harm suffered." *Moore*, 355 F.3d at 564.

> Certainly, an argument could be made that
> the availability of liquidated damages
> [under § 216(b)] would be sufficient to
> fully compensate a plaintiff with proof of
> actual economic damages but only minor,
> subjective mental anguish occasioned by an
> employer's violation of the [FLSA].
> However, in a case involving only nominal
> economic losses but proved retaliation
> consisting of concerted, directed
> harassment, resulting in grave emotional
> distress, such nominal economic damages or
> the available doubling of those damages
> would be insufficient to make the plaintiff
> whole. Damages for mental anguish would be
> the necessary compensatory legal relief
> "appropriate to effectuate the purposes of
> [the anti-retaliation provision]."

*Bogacki v. Buccaneers Ltd. P'ship*, 370 F.Supp.2d 1201, 1203 (M.D.Fla. 2005) (quoting 29 U.S.C. § 216(b)); *cf. Snapp*, 208 F.3d at 937 (reasoning that "district courts may have to exercise some creativity in awarding relief in retaliation cases" beyond those forms set forth in the statutory text).

The district courts holding that emotional distress damages are unavailable in FLSA actions have done so by relying on cases interpreting the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, which have uniformly held that such damages are not permitted under that statutory scheme. *E.g., Douglas v. Mission Chevrolet*, 757 F.Supp.2d 637, 640

17

(W.D.Tex. 2010).[9]  Emphasizing that the ADEA was patterned after the FLSA, *Lorillard v. Pons*, 434 U.S. 575, 579 (1978), these courts have noted the similarity in language between the remedies provisions of the two statutes and concluded that the unavailability of emotional distress damages under the ADEA renders those damages unavailable under the FLSA, *Douglas*, 757 F.Supp.2d at 640.  This conclusion, however, fails to consider that the relief authorized under both statutes must be determined "not in isolation, but in conjunction with the other provisions of the Act[s], the policies they further, and the

---

[9] The remedies provision of the ADEA provides, in relevant part, as follows:

> Amounts owing to a person as a result of a violation of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime compensation . . . :  *Provided*, That liquidated damages shall be payable only in cases of willful violations of this chapter. In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section.

29 U.S.C. § 626(b).

18

enforcement framework[s] they envision." *Dean*, 559 F.2d at 1038; *cf. Lorillard*, 434 U.S. at 582 ("[The] selectivity that Congress exhibited in incorporating provisions and in modifying certain FLSA practices strongly suggests that but for those changes Congress expressly made, it intended to incorporate fully the remedies and procedures of the FLSA [into the ADEA.]").

The ADEA includes an administrative conciliation process that is critical to its enforcement framework. 29 U.S.C. § 626(b); *Bogacki*, 370 F.Supp.2d at 1204-05. Looking to this process, circuit courts have repeatedly held that emotional distress damages are unavailable in ADEA actions because they would impede mediation and conciliation by discouraging early resolution of ADEA claims. *Pfeiffer v. Essex Wire Corp.*, 682 F.2d 684, 687 (7th Cir. 1982); *Slatin v. Stanford Research Inst.*, 590 F.2d 1292 (4th Cir. 1979) (noting that "pain and suffering damages are inconsistent with the administrative aspects of the ADEA enforcement scheme"); *Dean*, 559 F.2d at 1038 (explaining that the availability of emotional distress damages in ADEA actions would "introduce[e] a volatile ingredient into the tripartite negotiations involving Secretary, employee and employer"); *Rogers v. Exxon Research & Eng'g Co.*, 550 F.2d 834, 839-42 (3[d] Cir. 1977), *overruled on other grounds by Smith v.*

*Joseph Schlitz Brewing Co.*, 584 F.2d 1231 (3$^{d}$ Cir. 1978) (citing the mediation and conciliation process as one reason emotional distress damages were unavailable in an ADEA action).[10]   The FLSA includes no such conciliation provision.   *Lorillard*, 434 U.S. at 580.

This difference is instructive, and it must be considered when determining whether a plaintiff in an FLSA action may recover emotional distress damages.   *See Gilmer v. Interstate/Johnson Lane Corp.*, 895 F.2d 195, 199 (4th Cir. 1990) (acknowledging certain differences between the ADEA and the FLSA, despite the similarities in the two statutory texts, based on the presence of conciliation provisions in the former); *cf. Dorosiewicz v. Kayser-Roth Hosiery, Inc.*, 823 F.2d 546, 1987 WL 37945, at *2 (4th Cir. 1987) (unpublished table opinion) ("The . . . provisions of the FLSA that are incorporated into the ADEA

---

[10] Due to the similarities between the statutes, both *Slatin* and *Rogers* also looked to pre-1977 version of the FLSA when reaching this conclusion, noting that courts applying the earlier version of the FLSA had "consistently refused to grant FLSA litigants compensatory damages, other than those specifically enumerated in the Act." *Slatin*, 590 F.2d at 1296; *Rogers*, 550 F.3d at 839-42.   This reasoning does not change the outcome of the present case, however, because the only remedies set forth in the pre-1977 version of the statute were unpaid minimum wages, unpaid overtime compensation, and "an additional equal amount as liquidated damages" plus attorneys' fees. *Travis*, 921 F.2d at 111 (internal quotation marks omitted). Upon enactment of the 1977 amendments, § 216(b) expressly permitted courts to provide forms of relief beyond those enumerated in the statute.

must be viewed in the context of the different policy considerations underlying the two acts."). For this reason, ADEA cases holding that a plaintiff may not recover emotional distress damages do not mandate – or even necessarily support - the conclusion that such damages are unavailable under the FLSA. *Bogacki*, 370 F.Supp. at 1205.

Because "full compensation is the evident purpose and paramount policy" in an FLSA retaliation action, "the more reasoned approach" would permit a plaintiff who makes a proper showing to recover damages for emotional distress. *Id.; Moore*, 355 F.3d at 563-64. Neither party here has addressed the strength or weakness of Plaintiffs' evidence of alleged emotional distress. Until the parties do so at trial, the court cannot conclude – as a matter of law – "that damages for mental anguish should be disallowed." *Id.* at 1205-06.[11] Plaintiffs

---

[11] Although a jury trial will now be held to determine the amount of Plaintiffs' damages from emotional distress, it is worth noting that Plaintiffs would have been entitled to a jury trial on the issue of lost wages regardless of whether emotional distress damages were available under the FLSA. *Lorillard*, 434 U.S. at 580; *see also Lewis v. Times Publ'g Co.*, 185 F.2d 457, 457 (5th Cir. 1950) (concluding that an FLSA action in which the plaintiff sought a monetary award for unpaid wages required a jury trial). Indeed, the Fourth Circuit has previously explained that awards for lost wages may constitute "legal relief" in certain circumstances. *Troy v. City of Hampton*, 756 F.2d 1000, 1002-03 (4th Cir. 1985) (explaining that back pay under the ADEA is "traditionally a legal remedy," even though it is an equitable remedy under other statutes, such as Title VII).

will be permitted to seek emotional distress damages through a
jury trial, and their motion on this issue will, therefore, be
granted.[12]

## III. Plaintiffs' Motion to Publish the Court's August 8, 2011, Opinion

Plaintiffs have also filed a motion requesting that the
court publish its August 8, 2011, memorandum opinion in the
Federal Supplement.  They articulate no reason for seeking
publication and acknowledge that "[t]here does not appear to be
a local rule governing the publication of opinions."  (ECF No.
106, at 1).  Plaintiffs attempt to argue that Fourth Circuit
Local Rule 36(a) "provides guidance" on this issue.  (*Id.*).[13]

---

[12] Plaintiffs submitted a jury instruction from the Third
Circuit regarding emotional distress damages in retaliation
cases, but neither party addressed the language of the
instruction in their motion papers.  Because the parties'
arguments center on the propriety of instructing the jury on
emotional distress damages, rather than on the language of the
instruction itself, the phrasing of the instruction that the
jury will receive need not be decided when resolving the
presently pending motions.

[13] This local rule provides, in relevant part, as follows:

> Opinions delivered by the Court will be
> published only if the opinion satisfies one
> or more of the standards for publication:

22

Local Rule 36(a), however, governs publication of decisions by the Fourth Circuit, not the district court. Indeed, "a [district] court ordinarily is given broad discretion in the writing and publication of its opinions." *Krull v. Celotex Corp.*, 827 F.2d 80, 83 (7th Cir. 1987) (discussing the "precedential weight" of decisions published in the Federal Supplement (quoting *Lowenschuss v. W. Publ'g Co.*, 542 F.2d 180, 183 (3d Cir. 1976))).

Plaintiffs' request may stem from the mistaken belief that opinions published in the Federal Supplement are somehow entitled to greater weight than those published on Westlaw or LexisNexis.

> [But w]hether a district court decision is reported in the Federal Supplement is insignificant in the modern era of computerized legal research. District judges may decide to publish or not publish a given decision in West's bound volumes for any number of reasons, but the fact of publication in hard copy does not make a district court decision any more or less

---

i.   It establishes, alters, modifies, clarifies, or explains a rule of law within this Circuit; or

ii.  It involves a legal issue of continuing public interest; or

iii. It criticizes existing law; or

iv.  It contains a historical review of a legal rule that is not duplicative; or

v.   It resolves a conflict between panels of this Court, or creates a conflict with a decision in another circuit.

> precedential or persuasive than one that is
> only published electronically.

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. BP Amoco P.L.C.*, 319 F.Supp.2d 352, 362 n.6 (S.D.N.Y. 2004); *see also Miner v. Clinton Cnty.*, No. 8:06-CV-728 (GLS/RFT), 2009 WL 2156969, at *2 (N.D.N.Y. July 16, 2009) ("Contrary to plaintiffs' counsel's contention, the fact that [a district court opinion] was not published in the Federal Supplement is entirely immaterial to its weight."); *Smith v. Astrue*, 639 F.Supp.2d 836, 841-42 (W.D.Mich. 2009) (explaining that district court opinions are merely persuasive authority for non-parties to a case, "whether published in the Federal Supplement books or not"); *Welch v. Unum Life Ins. Co. of Am.*, 649 F.Supp.2d 1220, 1224 ("[T]he court sees little relevance of whether the case is included in a bound volume versus being available on-line.").

Given that the weight of the court's August 8, 2011, opinion is unaffected by publication and Plaintiffs have articulated no other basis for their request, the motion to publish will be denied. *United States v. Arnett*, No. CR-F-95-5287 OWW, 2006 WL 2796448, at *22 (E.D.Cal. July 20, 2006) (denying a motion to publish where the petitioner provided no authority to support the request); *Cartwright v. District of Columbia*, 267 F.Supp.2d 83, 87 (D.D.C. 2003) (denying the

24

plaintiffs' motion to publish and reasoning that the "motion [was] not an appropriate issue for adjudication").

## IV.  ADT's Motion to Identify a "Rebuttal" Expert

ADT moved to identify an expert to respond to Dr. Morse's amended report thirty days after its counsel had deposed Dr. Morse about the report.  According to ADT, Rule 26(a)(2)(D)(ii) gave ADT thirty days from the date of Dr. Morse's deposition to file its motion regarding the need for an expert.  ADT contends that the court should grant its request because of opinions that Dr. Morse "offered for the first time at his deposition on February 20, 2012" about his calculation of Ms. Thompson's mitigating income.  (ECF No. 94-1, at 1).[14]  Plaintiffs oppose this request, asserting that all opinions and methodology in Dr. Morse's amended report regarding this issue were set forth in his initial report, which Plaintiffs submitted to ADT in July 2010.

At the outset, despite apparent agreement between the parties about the applicability of Rule 26(a)(2)(D)(ii) to this issue, that rule does not govern here.  Rule 26(a)(2)(D) provides, in relevant part, as follows:

---

[14]  Mitigating income refers to income that Ms. Thompson earned following her termination from ADT.  This income offsets income purportedly lost as a result of the unlawful termination.

> A party must make these [Rule 26(a)(2)]
> disclosures at the times and in the
> sequence that the court orders.  Absent a stipulation
> or court order, the disclosures must be
> made: . . . (ii) if the evidence is intended
> solely to contradict or rebut evidence on
> the same subject matter identified by
> another party under Rule 26(a)(2)(B) or (C),
> within 30 days after the other party's
> disclosure.

ADT asserts that the scheduling orders in this case did "not specify a date by which [it] was to produce any rebuttal reports." (ECF No. 94-1, at 2). This assertion, however, overlooks the fact that the court's initial scheduling order expressly stated that ADT would provide its expert disclosures to Plaintiffs by July 7, 2010, thirty days after Plaintiffs' expert disclosures were due. (ECF No. 26). ADT clearly understood this deadline to encompass identification of experts prompted by Plaintiffs' expert disclosures, as the company subsequently requested that the court extend the due date for its expert disclosures because it could "[]not properly evaluate its need for an expert witness without first reviewing Dr. Morse's [original] report." (ECF No. 39, at 2). Ultimately, upon the parties' request, the court revised the scheduling order to give ADT until September 10, 2010, to provide its

expert report to Plaintiffs.[15]   Because a scheduling order specified the deadline for ADT's expert disclosures, Rule 26(a)(2)(D)(ii) is inapplicable here, and ADT must satisfy Rule 16(b)'s good cause standard in order to modify the scheduling order. *Akeva, LLC v. Mizuno Corp.*, 212 F.R.D. 306, 309-10 (M.D.N.C. 2002).

"[A] scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Potomac Electric Power Co. v. Electric Motor Supply, Inc.*, 190 F.R.D. 372, 375 (D.Md. 1999) (internal quotation marks omitted)), *reconsideration denied*, 192 F.R.D. 511 (D.Md. 2000).   The Rule 16(b) analysis thus focuses on the timeliness of a requested amendment to the scheduling order and requires the movant to show that it acted diligently. *Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D.Md. 2002).   Indeed, while the court may also consider factors such as whether the non-moving party could be prejudiced by the delay and the length of the delay, *Tawwaab v. Va. Linen Serv., Inc.*, 729 F.Supp.2d 757, 768-69 (D.Md. 2010), "the primary consideration . . . in [determin]ing whether 'good cause' has been shown under Rule

---

[15] The parties did not thereafter request any additional extensions of time with regard to ADT's expert disclosures. They did, however, request other revisions to the scheduling order, such as an extended deadline for submission of Plaintiffs' amended expert reports.

16(b) relates to the movant's diligence," *Reyazuddin v. Montgomery Cnty., Md.*, No. DKC 11-0951, 2012 WL 642838, at *3 (D.Md. Feb. 27, 2012).  "Lack of diligence and carelessness are the 'hallmarks of failure to meet the good cause standard.'" *Id.*

Here, ADT has failed to demonstrate that it acted diligently in moving to revise the scheduling order at this late date.  On March 21, 2012, with trial slightly more than four months away, ADT moved to identify an expert to respond to purportedly new opinions that Dr. Morse offered during his February 20, 2012, deposition.  According to ADT, until Dr. Morse's deposition, ADT was unaware that Dr. Morse had used the net income listed on Ms. Thompson's tax return to compute the economic loss cited in his amended report.  ADT moves to identify an expert who can testify at trial that "when determining lost earnings of the self-employed, there is a distinction between net taxable income listed on a tax return and economic income." (ECF No. 94-1, at 4).  ADT's expert would also testify that certain expenses on Schedule C of Ms. Thompson's 2010 federal tax return "appear to be excessive." (*Id.*).  Through this testimony, ADT seeks to demonstrate that the economic loss estimate provided by Dr. Morse is inflated,

and that the loss Ms. Thompson actually suffered was significantly lower.

The problem with this effort is that ADT was on notice about both of these issues as of July 2010, when Plaintiffs' provided Dr. Morse's original report to the company, but did not identify an expert to address them.[16]   In the original report, Dr. Morse stated that he calculated Ms. Thompson's mitigating income using an income figure from her 2009 federal tax return. (ECF No. 94-2, at 2-4).   Plaintiffs provided ADT with a copy of this tax return within days of submitting Dr. Morse's original report, and the return indicated that the income figure Dr. Morse used was Ms. Thompson's net taxable income.   Despite receiving this information, ADT did not make any expert disclosures by the deadline it had requested in the scheduling order.   Similarly, even though the expenses on Schedule C of Ms. Thompson's 2009 tax return were higher as a proportion of her gross sales than the 2010 expenses ADT now challenges, ADT never contended that these 2009 expenses were excessive or identified an expert to testify about this issue at trial.   ADT's failure to do so until March 2012 – more than twenty months after Plaintiffs' disclosure of Dr. Morse's original report –

---

[16] For this reason, the cases on which ADT relies to support its motion – which involve new opinions that were not included in earlier expert reports – are inapposite.

indicates a lack of diligence, warranting denial of its motion to identify a "rebuttal" expert. *See Dag Enters., Inc. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 106-08 (D.D.C. 2005) (declining to modify the scheduling order to permit additional discovery when the plaintiffs were on notice about an issue well before the time when they requested additional discovery); *cf. United States v. 14.3 Acres of Land, more or less, situated in San Diego Cnty., Ca.*, No. 07cv886-W(NLS), 2009 WL 249986, at *6-8 (S.D.Cal. Jan. 30, 2009) (refusing to permit the defendants to designate a new report in response to the Government's supplemental expert report where the supplemental report set forth the same conclusion as the original report and the defendants were on notice about the relevant issue after receiving the original report).

The fact that the trial is now less than two months away supports the conclusion that ADT's motion should be denied. Indeed, if the court granted the motion, Plaintiffs would have little time to respond to the report of ADT's expert, particularly as it appears that the report has not yet been prepared. (ECF No. 94-1, at 7). This lack of response time may well prejudice Plaintiffs at trial. *See Benedict v. Zimmer, Inc.*, 232 F.R.D. 305, 319 (N.D.Iowa 2005) (refusing to permit the plaintiffs to submit expert reports after the deadline set

forth in the scheduling order and "little more than two months in advance of trial" because the defendant "would have insufficient time to prepare to refute the evidence at trial"). Because ADT has wholly failed to demonstrate good cause, its motion to identify an expert to respond to Dr. Morse's amended report will be denied.[17]

## V.   Motions to Seal

Both parties have also filed motions to seal.  A motion to seal must comply with Local Rule 105.11, which provides:

> Any motion seeking the sealing of pleadings, motions, exhibits or other papers to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections.  The Court will not rule upon the motion until at least 14 days after it is entered on the public docket to permit the filing of objections by interested parties.  Materials that are the subject of the motion shall remain temporarily sealed pending a ruling by the Court.  If the motion is denied, the party making the filing will be given an opportunity to withdraw the materials.

---

[17] Denial of ADT's motion does not prevent its counsel from emphasizing the potential weaknesses in Dr. Morse's methodology at trial.  Much like the process employed during Dr. Morse's deposition, counsel may cross-examine Dr. Morse about the reason he used Ms. Thompson's net income instead of her gross sales income when calculating mitigating income and whether he assessed the reasonableness of her Schedule C expenses in determining this value.

This rule endeavors to protect the common law right to inspect and copy judicial records and documents, *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), while recognizing that competing interests sometimes outweigh the public's right of access, *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).

Before sealing any documents, the court must provide the non-moving party with notice of the request to seal and an opportunity to object. *Id.* This notice requirement may be satisfied by either notifying the persons present in the courtroom or by docketing the motion "reasonably in advance of deciding the issue." *Id.* at 234. Finally, the court should consider less drastic alternatives to sealing, such as filing redacted versions of the documents. If the court decides that sealing is appropriate, it should also provide reasons, supported by specific factual findings, for its decision to seal and for rejecting alternatives. *Id.* at 235.

ADT seeks to seal certain exhibits (or portions of exhibits) filed in connection with its motion to identify a "rebuttal" expert, as well as portions of the memorandum it

submitted in support of that motion.[18]   Plaintiffs seek to seal
one exhibit (Ms. Thompson's 2009 tax return) submitted in
conjunction with their opposition to ADT's motion to identify a
"rebuttal" expert.   These motions stand unopposed despite having
been on the docket for at least two months, and Plaintiffs'
motion is in fact a consent motion.   All of the documents the
parties wish to seal have been produced pursuant to a stipulated
protective order under a "confidential" designation.   Given that
these documents contain Ms. Thompson's tax returns and other
personal financial data or discuss such information, this
designation is warranted.   *See Pittston Co. v. United States*,
368 F.3d 385, 406 (4th Cir. 2004) (affirming decision to seal
certain "confidential, proprietary, commercial, or financial
data" that was produced under a protective order); *TransPacific
Tire & Wheel, Inc. v. Orteck Int'l, Inc.*, No. DKC 2006-0187,
2010 WL 2774445, at *3 (D.Md. July 13, 2010) (granting a motion
to seal tax returns attached to a motion), *aff'd on other
grounds*, 457 F.App'x 256 (4th Cir. 2011) (unpublished opinion).
These materials will, therefore, be sealed.

---

[18]  Specifically, ADT seeks to seal entirely the exhibit
consisting of Ms. Thompson's 2010 tax return and other personal
financial data (ECF No. 94-4), and to seal in part references in
its memorandum and other exhibits to this information (ECF No.
94-1, at 2-3; ECF No. 94-2, at 3, 8, 9, 16, 17, 24, 25; ECF No.
94-3, at 7, 8, 15, 16, 23, 24; 94-5 at 4, 5).

**VI.   Conclusion**

For the foregoing reasons, Plaintiffs' "motion for trial date and for punitive damages instruction" will be granted in part and denied in part, while their "motion to publish" will be denied.   ADT's motion to identify a "rebuttal" expert will also be denied.   The parties' motions to seal will be granted.   A separate Order will follow.


                                    /s/
                              _____
                              DEBORAH K. CHASANOW
                              United States District Judge